UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| HOOSIER ENVIRONMENTAL COUNCIL and CITIZENS FOR APPROPRIATE RURAL ROADS, <br>      Plaintiffs, <br><br> vs. <br><br> UNITED STATES ARMY CORPS OF ENGINEERS, W.B. TEMPLE, Acting Commander and Acting Chief Engineer, United States Army Corps of Engineers, COL. LUKE T. LEONARD, Commander and District Engineer, United States Army Corps of Engineers, Louisville Division, <br>      Defendants, <br><br> and <br><br> INDIANA DEPARTMENT OF TRANSPORTATION, <br>      Defendant-Intervenor. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | 1:11-cv-0202-LJM-DML |


## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

This matter comes before the Court on Plaintiffs', Hoosier Environmental Council ("HEC") and Citizens for Appropriate Rural Roads ("CARR") (collectively, "Plaintiffs"), Motion for Summary Judgment [dkt. no. 50], and Defendants', United States Army Corps of Engineers, W.B. Temple, Acting Commander and Acting Chief Engineer, United States Army Corps of Engineers and Col. Luke T. Leonard, Commander and District Engineer, United States Army Corps of Engineers, Louisville Division (collectively, "Federal Defendants"), Cross Motion for Summary Judgment [dkt. no. 75], and Defendant-Intervenor, Indiana Department of Transportation ("INDOT"), Cross Motion for Summary

Judgment [dkt. no. 73].[1]  Plaintiffs seek judicial review, under the Administrative Procedure Act, of the Army Corps of Engineers' (the "Corps") decision to issue a dredge and fill permit to INDOT, authorizing INDOT to discharge dredged and fill material into waters of the United States.  After reviewing the briefing and hearing argument on these motions, the Court rules as follows.

## I.  BACKGROUND

Broadly, this case concerns an extension of Interstate 69 ("I-69") through the southwestern quadrant of Indiana.  The history of Indiana's search for a route to build a major highway through this portion of the state has been extensively documented in an earlier case.  *See Hoosier Envtl. Council v. U.S. Dep't of Transp.*, No. 1:06-cv-1442-DFH-TAB, 2007 U.S. Dist. LEXIS 90840, at *3-*9 (S.D. Ind. Dec. 10, 2007) (Hamilton, J.).  On June 9, 1998, as part of the Transportation Equity Act for the 21st Century, Pub. L. No. 105-178 § 1211(i)(1)(D)(i), 112 Stat. 107, 189, Congress designated a corridor from Indianapolis to Memphis via Evansville as "Interstate Route 69" and extended its reach from Canada to Mexico (the "I-69 Project").  AR 82.

The stated project purpose for the Evansville to Indianapolis section of the I-69 Project is "to provide an improved transportation link between Evansville and Indianapolis which: [s]trengthens the transportation network in Southwest Indiana; [s]upports economic development in Southwest Indiana; and [c]ompletes the portion of the National I-69 project

---

[1] The Federal Defendants and INDOT (collectively, "Defendants") have filed a joint Unopposed Motion to Supplement the Administrative Record [dkt. no. 70].  The Court **GRANTS** the motion.

between Evansville and Indianapolis." AR 30. The corridor selection process was tiered. Tiering is "the coverage of general matters in broader environmental impact statements . . . with subsequent narrower statements or environmental analyses (such as . . . ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared." 40 C.F.R. § 1502.20. Essentially, "[i]n the first tier, the 'big picture' issues are addressed, while taking into account the full range of impacts. After the 'big picture' issues are resolved in tier 1, the focus shifts in Tier 2 NEPA studies to issues associated with a more exact determination of impacts, and avoidance and mitigation of adverse impacts." AR 31. With respect to the I-69 Project, in the tier 1 analysis under the National Environmental Policy Act ("NEPA"), INDOT, and the Federal Highway Administration ("FHWA") chose the general route for the Indianapolis to Evansville branch of the I-69 project, and then in tier 2, there was to be a more detailed study of six sections of that overall route.

In the tier 1 screening process, INDOT and the FHWA chose twelve build alternatives and a no-build alternative with respect to the overall corridor from Indianapolis to Evansville for review. AR 538-39. The alternatives listed in the draft environmental impact statement ("DEIS") included Alternative 1, a proposed corridor utilizing existing Interstate Highway 70 west from Indianapolis to Terre Haute, AR 555, and then following existing U.S. Highway 41 south to Evansville, and Alternative 3C, the ultimate preferred alternative. The DEIS concluded that Alternative 1 was non-preferred. *Id.* A number of comments on the DEIS, including one from the Environmental Protection Agency ("EPA"), requested that FHWA and INDOT reconsider the finding that Alternative 1 was non-preferred. AR 556. In response, FHWA and INDOT re-examined and developed new data

3

on Alternative 1.  AR 556-63.  The new analysis showed that Alternative 1 was less able to meet project goals than Alternative 3C.  AR 562.

By April 2003, the Corps had stated in public comments to the tier 1 DEIS that it would not be issuing a single Section 404 permit for the overall alignment chosen for the Indianapolis to Evansville.  AR 990.  Instead, the Corps determined that "it would be appropriate to submit one application for each segment of highway that has independent utility."  *Id.*  Although the Corps would be considering permit applications on smaller sections of the overall alignment, after an interagency meeting in April 2003, the Corps requested that the FHWA and INDOT include a "Section 404(b)(1) consistency analysis" in the Final Environmental Impact Statement ("FEIS").  AR 3541.

In the "consistency analysis," FHWA and INDOT summarized their view of the 404(b)(1) Guidelines as requiring that, in order to qualify for a Section 404 permit, a project must be the "least environmentally damaging practicable alternative" ("LEDPA"); that the project not violate state water quality standards or other laws, including the Endangered Species Act; that the project not cause or contribute to "significant degradation of the waters of the United States; and that the project include appropriate provisions to minimize and mitigate adverse impacts on the aquatic ecosystem."  AR 973.  The consistency analysis included a detailed summary of the alternatives considered in the DEIS and the FEIS, concluding that Alternative 1 "has low performance on all project goals".  AR 976.  Instead, it concluded, Alternative 3C "is the practicable alternative with the least impacts to the aquatic ecosystem, which does not have other significant adverse environmental consequences."  AR 981.  "These factors show that the selected Alternative 3C is the LEDPA and meets all Section 404(b)(1) Guidelines for the selection of an alternative."  AR

4

987.  The Corps was concerned with the language chosen by INDOT and the FWHA in the consistency analysis that suggested that Alternative 3C was "consistent" with the Section 404(b)(1) guidelines.  Supp. AR at FHWA 22619.  The Corps recommended that the tier 1 Record of Decision ("ROD") include a "clarification that the Corps has not formally made or concurred in a determination of consistency with the Section 404(b)(1) guidelines." *Id.*

On October 2, 2006, after the tier 1 FEIS and ROD were issued, Plaintiffs and others filed a complaint in the Southern District of Indiana against the United States Department of Transportation, FHWA, the Department of the Interior, the United States Fish and Wildlife Service, INDOT, and the Corps ("HEC I").  *Hoosier Env't Council v. U.S. Dep't of Transp.*, No. 1:06-cv-1442-DFH-TAB, 2007 U.S. Dist. LEXIS 90840, at *3-*9 (S.D. Ind. Dec. 10, 2007).  The original complaint included, among others, claims made under Section 404 of the Clean Water Act ("CWA") and the Administrative Procedure Act.  *HEC I* Compl. at 45.  However, plaintiffs in *HEC I* were granted permission to amend their complaint, and the new complaint did not include the Corps or its officials as defendants and it contained no CWA claims.  *HEC I* First Am. Compl. for Permanent Declaratory & Injunctive Relief.


In his *HEC I* Order, then-District Judge Hamilton granted the defendants' motions for summary judgment and denied plaintiffs' motion for the same.  *See HEC I*, 2007 U.S. Dist. LEXIS 90840, at *76.  As to the decision to analyze the project in tiers, the court concluded that the "choice to analyze the impacts of such a large project in tiers was not arbitrary or capricious," and further that, "it is impractical and unnecessary to require a site specific analysis for each alternative considered in a project the size of Interstate 69."  Id. at *20, *23.  With respect to the CWA issues, the court stated:

5

> Under the Clean Water Act, the Army Corps and EPA might end up agreeing with INDOT's and FHWA's determination that Alternative 3C is the most suitable route, but they also might not. The selection of preferred alternatives in the first tier provides no more than guidance on that issue and does not control the final determination under the Clean Water Act.

*Id.* at *49.

In the Tier 1 FEIS, FHWA and INDOT described the six sections that comprise Alternative 3C, the preferred alternative for the overall I-69 corridor. Section 3, the part of the alignment that is the subject of this suit, runs from U.S. Highway 50, near Washington, Indiana, north to U.S. Highway 231 near Scotland, Indiana, a distance of about 25.3 miles. AR 593. The stated purpose for Section 3 is to advance the overall goals of the Evansville to Indianapolis I-69 project, while also serving local needs such as completing Section 3; personal accessibility for local residents and communities; improving traffic safety; and enhancing local economic development. AR 3784-87. The tier 2 process for Section 3 involved the selection of a precise route within Alternative 3C. As part of the alternatives analysis in tier 2, FHWA and INDOT broke Section 3 into five different segments, with a variety of alternative routes within each segment. Nine "segment alignments" were carried forward for additional study. AR 11728-41. Eventually, INDOT and FHWA selected "Refined Alternative 1" as the alternative that best satisfied the project purposes while having an acceptable level of impacts. AR 11741. The preferred alignment for Section 3 would affect approximately 2.4 acres of emergent wetlands; 1.45 acres of forested wetlands; 1.18 acres of "scrub-shrub" wetlands; 2.22 acres of open ponds; and approximately 9,994 linear feet of streams within the right-of-way to be relocated. AR 11744.

On January 29, 2009, a DEIS was issued for tier 2 analysis of Section 3.  On December 3, 2009, the FEIS was issued for the same, AR 3638, and on January 28, 2010, the ROD for Section 3 was issued, AR 11702.  On January 8, 2010, Bernardin Lochmueller and Associates, Inc. filed an application for a Section 404 permit on behalf of INDOT.  AR 13673.  On February 12, 2010, a public notice of the application was issued with a comment period extending through March 13, 2010.  *Id.*  On July 12, 2010, the Corps issued a permit authorizing the proposed work, subject to certain conditions.  *Id.*  On September 7, 2010, the permit was suspended because a review of the permit filed revealed that the procedural requirements of the Corps' regulation regarding public hearing determinations had not been followed prior to the issuance of the permit.  *Id.*  On September 15, 2010, after the procedural issue was corrected, the Corps issued a revised "department of the Army Permit Evaluation and Decision Document" which reinstated the permit.  AR 13740.

The permit authorized INDOT to discharge 30,652 cubic yards ("cys") below the ordinary high water mark of 8,925 linear feet of Doans Creek.  AR 13575.  In addition, the permit authorized INDOT to discharge 184,924 cys of fill material into 4.64 acres of adjacent open water, emergent, scrub-shrub, and forested wetlands to construct six crossings of Section 3 of the I-69 extension.  *Id.*  The permit included both "general conditions" and several "special conditions."  AR 13576.  The first special condition required INDOT to create or restore 6,850 linear feet of stream, and 11.5 acres of wetlands, in accordance with the "Cornelius Mitigation and Monitoring Plan" dated January 5, 2010.  *Id.*  Other special conditions indicated that the permit did not authorize INDOT to take an endangered species, in particular the Indiana bat.  *Id.*  Further, INDOT was to take

7

measures to protect historic properties and return a "Completion Certification" when the work was completed. *Id.*

In the "Scope of Analysis" section of the Decision Document, the Corps stated that the permit would only include discharge of fill material into "waters of the U.S." associated with the construction of six bridge or culvert crossings. AR 13713. Accordingly, the analysis only includes the jurisdictional "waters of the U.S." that would be filled, directly or indirectly, by the construction of these structures and the immediate adjacent riparian corridor. *Id.* The Corps stated that "[a] broader scope is not appropriate because the CWA does not provide the Corps legal authority to regulate interstate highway projects . . . beyond the limits of the 'waters of the U.S.'" *Id.* Ultimately, the Corps concluded that the "issuance or denial of the requested permit would not constitute a major Federal action that would significantly affect the quality of the human environment" and, as a result, NEPA did not require an Environmental Impact Statement in connection with the permit. AR 13740.

The "Project Purpose and Need" section of the Corps' Decision Document stated that "[t]he purpose of the proposed fill is to construct six separate and complete crossings for the construction of Section 3 of the Interstate 69 highway extension project between Evansville and Indianapolis, Indiana." AR 13712. It went on to state that "[t]he proposed Evansville to Indianapolis interstate highway extension is needed to provide an improved transportation link that strengthens the transportation network in Southwest Indiana, support economic development in Southwest Indiana, and complete the portion [of] the National Interstate 69 Project between Evansville and Indianapolis." *Id.* Specifically with respect to Section 3, the Corps stated that its construction "would advance the overall goals

8

of the Interstate 69 project, increase personal accessibility for area residents, improve traffic safety, and support local economic development initiatives." *Id.*

The Corps engaged in a discussion of alternatives in its Decision Document. After outlining the tiering process INDOT and FHWA engaged in to analyze the route alternatives, the Corps stated:

> In light of FHWA's detailed alternatives analysis of alternative corridors for the Interstate 69 project, between Evansville and Indianapolis, Indiana in the Tier I FEIS, its selection of the least environmentally damaging alternative corridor in the Tier I ROD, and its detailed alternatives analysis of the alternative alignments within Section 3 of the corridor selected in the Tier I ROD, the alternatives considered by the Corps in this document are limited to the crossings associated with the 5 practicable alignments identified by FHWA in the Tier II FEIS and the no action alternative.

AR 13715-16. The Corps then considered the impacts of the "no build" alternative, Refined Preferred Alternative 1 for Section 3, and the other alternatives examined by INDOT and FHWA. AR 13716-19. After examining each of the alternatives, the Corps concluded that Refined Preferred Alternative 1 was the alternative that met the project purposes that had the "least adverse impact on 'waters of the U.S.'" AR 13716. In the appendix to its Decision Document, the Corps responded affirmatively to the question whether, "[b]ased on the alternatives discussion, if the project is in a special aquatic site and is not water dependent, has the applicant clearly demonstrated that there are no practicable alternative sites available?" AR 13742.

The Corps noted that the EPA did not object to issuing a Section 404 CWA permit for the project as proposed. AR 13719. The Corps further noted that in response to the public notice of the application, it received eleven comment letters from the general public, ten of which objected to the proposal. The Corps stated that the major objection raised by

HEC, CARR, and the Environmental Law and Policy Center was that it was "inappropriate to segment the Interstate 69 extension into sections for the purpose of environmental review and permitting."  AR 13721.  The Corps noted that INDOT's response to this objection was that "Tier 2 sections were approved in the Tier 1 ROD and that each section serves an independent, significant, stand-alone transportation purpose in addition to serving as a portion of the Interstate 69 extension."  AR 13721-22.

The Corps addressed the objection that it had not completed an analysis of the LEDPA.  In the Decision Document, the Corps states that in a letter to FHWA dated September 23, 2003, it

> concurred with the two-tier EIS process and recommended further site assessment and construction measures be studied in Tier 2 to further avoid and minimize impacts to "waters of the U.S."  The Corps stated that this analysis would satisfy the Section 404(b)(1) guidelines to ensure that the construction method for each crossing of a "water of the U.S." is the least environmentally damaging practicable alternative when considering cost, existing technology and logistics in light of the overall project purpose.

AR 13723.

In its Decision Document, the Corps also discussed its public interest review.  It stated, "[i]n accordance with 33 CFR 320.4(a), the decision whether to issue a permit is based on an evaluation of the probable impacts including cumulative impacts of the proposed activity and its intended use on the public interest."  AR 13724.  The Corps then proceeded to discuss the physical and chemical characteristics and anticipated changes resulting from the permitted discharges.  *See* AR 13724-28.  Specifically, it examined the effect the anticipated discharges would have on existing currents, circulation or drainage patterns; suspended particulates; turbidity; water quality; flood control functions; storm,

10

wave, and erosion buffers; erosion and accretion patterns; aquifer recharge; baseflow; and mixing zone.  *Id.*

The Corps also examined biological characteristics and anticipated changes resulting from the proposed discharges.  AR 13728-32.  The Corps concluded that "[c]ompensation for all of wetland impacts would be provided through wetland creation at the off-site Cornelius Mitigation Site," which is located within the same general watershed as the proposed impacts.  AR 1379.  The Corps also considered habitat for fish and other aquatic organisms; wildlife habitat; endangered or threatened species; and biological availability of possible contaminants in dredged or fill material.  AR 13728-32.

The Corps then examined human use characteristics and impacts from the anticipated discharges.  AR 13732-39.   The factors considered included: existing and potential water supplies; water conservation; water related recreation; aesthetics; parks, national and historic monuments, wild and scenic rivers, wilderness areas, research sites, etc.; traffic/transportation patterns; energy consumption or generation; navigation; safety; air quality; noise; historic properties; land use classification; economics; prime and unique farmland; food and fiber production; general water quality; mineral needs; consideration of private property; cumulative and secondary impacts; and environmental justice.  *Id.*

Under the heading "Public Interest Considerations" the Corps examined the relative extent of the public and private need for proposed work.  AR 13739.  The Corps stated:

> The public and private need for the proposed project is to provide improved regional accessibility and Interstate and international movement of freight. The proposal would provide employment during construction and after for maintenance of the proposed crossings.  Indirectly, the changes in land use due to development induced by improved access are expected to yield an increase in business and employment.

11

*Id.*  Further, the Corps stated that the "proposed project has fewer impacts to aquatic resources than any of the other practicable alternatives."  *Id.*  "In summary, [the Corps] find[s] that all administrative requirements have been met, the proposed project is environmentally sustainable, and that issuance of the permit, properly conditioned, would not be contrary to the public interest."  AR 13740.

On February 9, 2011, Plaintiffs filed their Complaint.  Dkt. no. 1.  Plaintiffs request that the Court declare that the Corps violated Section 404 of the CWA by issuing the above discussed permit without fulfilling Section 404's requirements, vacate and remand the permit, and enjoin further construction of Section 3 and the remainder of the I-69 project until the Corps has complied with Section 404's requirements.  *Id.*  On June 19, 2012, the Court heard oral argument on the parties' cross motions.  Having considered the argument and the briefing, the Court rules as follows.

## II. <u>STANDARD</u>

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990).  Motions for summary judgment are governed by Federal Rule of Civil Procedure 56(a), which provides in relevant part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a fact either is or cannot be genuinely disputed.  Fed. R. Civ. P. 56(c)(1).  A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996).  It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence.  *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party.  *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996).  The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment.  *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996).  Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute.  *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992).  If the moving party does not have the ultimate burden of proof on a claim, it is sufficient for the moving

party to direct the court to the lack of evidence as to an element of that claim.  *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n.3 (7th Cir. 1994).  "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party."  *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

## III.  DISCUSSION

As an initial matter, the parties disagree on the effect that *HEC I* has on this case.  Specifically, Plaintiffs argue that *HEC I* compelled the Corps to make an independent Section 404 determination concerning the overall I-69 corridor under the CWA wholly apart from INDOT's and FHWA's prior selection of alternatives in the Tier 1 process.  INDOT, on the other hand, argues that *HEC I* stands for the proposition that the Corps did not violate the CWA by failing to conduct a Section 404 permit analysis on the entire corridor chosen for the Indianapolis to Evansville extension of I-69.

The Court's understanding of the *HEC I* decision is much less prescriptive than the understanding of either of the parties.  In *HEC I*, the court did not make any ruling with respect to a CWA claim because none was before it.  Accordingly, there is no legal "holding" or statement essential to the holding of the case to be enforced through res judicata principles on any CWA claim presented in this suit.  *See Am. Nat'l Bank & Trust Co. v. Reg'l Transp. Auth.*, 125 F.3d 420, 430 (7th Cir. 1997).  Indeed, the conclusion reached by the *HEC I* court with the most bearing on this case is that "[t]he use of tiering here does not violate NEPA or other environmental laws", *HEC I*, 2007 U.S. Dist. LEXIS 90840, *25, and further that "the decision to wait until the second tier to conduct site-

14

specific analyses, including applying for Clean Water Permits, was a reasonable one given the large scope of the I-69 project." *Id.* at *46, n.6.  Accordingly, to the extent that Plaintiffs seek to re-litigate the tiering issue, they are barred by the principles of collateral estoppel from doing so here.  *See Am. Nat'l Bank & Trust Co.*, 125 F.3d at 430 (stating that if an identical issue is decided in prior litigation, there was final judgment on the merits in the prior litigation and the party against whom estoppel is asserted was a party or in privity with a party to the prior litigation, then collateral estoppel applies to bar re-litigation of the issue).

However, Plaintiffs have not styled their suit as one challenging INDOT and FHWA's tiering decisions, but rather as one challenging the Corps' decision to issue a Section 404 permit for Section 3 of Alternative 3C.  Accordingly, this Court concludes that *HEC I* simply asserts that the Corps is under an unequivocal duty to undertake an alternatives analysis of all routes for which a Section 404 permit is sought, but does not bind the Corps to a higher standard than what the CWA statutorily requires.  *See HEC I*, 2007 U.S. Dist. LEXIS 90840, at *51 (stating that "[a]cting agencies like FHWA and INDOT cannot lessen the obligations the CWA imposes on the Army Corps and the EPA by the use of tiering or through the selection of preferred alternatives.  The CWA requires a rigorous level of environmental protection, though the use of tiering in this project means that the Clean Water Act protections will not be triggered until the agencies reach the second tier of analysis").  Therefore, the Court proceeds to consider the Plaintiffs' substantive challenge to the Section 404 permit.

In an action for review of the grant of a Section 404 permit, the Court must examine the administrative record to determine whether the Corps "made an arbitrary or capricious decision, abused its discretion, acted contrary to law or regulation, or lacked the support

of substantial evidence." *St. Clair v. Sec'y of Navy*, 155 F.3d 848, 850 (7th Cir. 1998).  This standard is deferential, and a court "will uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned."  *Id.*  In fact, "administrative decisions should be set aside . . . only for substantial procedural or substantive reasons as mandated by statute . . . not simply because the court is unhappy with the result reached."  *Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council*, 462 U.S. 87, 97 (1983).  Although an agency's decision is entitled to deference, "[d]eference must not 'shield [an agency] action from a thorough, probing, in-depth review.'"  *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971)).  Accordingly, the Court must ensure that the Corps took a "hard look" at the potential environmental impact of the proposed project, and based its decision on a "rational consideration of relevant factors."  *Van Abbema v. Fornell*, 807 F.2d 633, 636 (7th Cir. 1986).

The CWA makes the "discharge of any pollutant" into navigable waters by any person unlawful, absent compliance with specific provisions of the Act.  *See* 33 U.S.C. §§ 1311(a), 1362(7), 1362(12).  One of those provisions is Section 404, which creates a permitting system for the discharge of pollutants.  Specifically, Section 404 authorizes the Corps to regulate discharges of dredged and fill material into certain wetlands through issuing permits.  33 U.S.C. § 1344.  The Corps issues individual permits, like the one involved in this case, on a case-by-case basis after a review that involves site-specific documentation and review, public interest review, and a formal determination.  *See* C.F.R. §§ 323, 325.

The Section 404(b)(1) Guidelines, issued by the EPA under CWA Section 404(b)(1), 33 U.S.C. § 1344(b)(1), provide that the Corps should not issue a Section 404 permit "if

16

there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."  40 C.F.R. § 230.10(a).  "Aquatic ecosystem" means "waters of the United States, including wetlands, that serve habitat for interrelated and interacting communities and populations of plants and animals."  40 C.F.R. § 230.3(c).  An alternative is considered "practicable" if it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  40 C.F.R. § 230.10(a)(2).

If the activity for which a Section 404 permit is sought is not "water dependent," that is, "does not require access or proximity to or sitting within a "special aquatic site," like a wetland, then "practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise."  40 C.F.R. § 230.10(a)(3).  Further, where the proposed discharge is into a wetland, practicable alternatives not involving a discharge into a special aquatic site "are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise."  *Id.* "Classification of an activity as 'non-water dependent' does not serve as an automatic bar to issuance of a permit . . . [it] simply necessitates a more persuasive showing than otherwise concerning the lack of alternatives."  *La. Wildlife Fed'n, Inc. v. York*, 603 F. Supp. 518, 527 (W.D. La. 1984).

Plaintiffs assert that the CWA requires the Corps to undertake an analysis of whether there is a less damaging practicable alternative for the entire I-69 project.  In essence, Plaintiffs suggest that if the Corps does not evaluate alternatives for the overall corridor, then the tiering process has allowed INDOT an end run around the CWA.

17

However, Plaintiffs cite no law to support the proposition that the Corps must evaluate alternatives for the entire project when INDOT is only seeking a permit for one sub-section of the project.  The Court concludes that in this instance, the tiering process does not thwart the intent of the CWA.  Indeed, Alternative 3C has been divided into sections, and permits have been sought for those sections that require permits.  The Corps is required to make a full and independent evaluation of the practicable alternatives available for route selection in each of the sections for which a permit is sought.  If granting a permit for one section of the route proved impossible under strictures of the CWA, then it is possible that INDOT and the FHWA might have re-evaluate overall alignment alternatives, but there is no CWA requirement that the Corps must take it upon itself to examine alternatives to a project for which no permit is sought.  Accordingly, the Court concludes that the CWA does not require the Corps to consider alternatives to the entire corridor route when analyzing a permit application for a subs-section of the overall corridor.

In oral argument, Plaintiffs' counsel posited that the overall alignment embodied in Alternative 1 might be a practicable alternative to the route for which a permit is sought with respect to Section 3 because the stated purposes for Section 3 include advancing the overall goals of the Evansville to Indianapolis I-69 project.  AR 3784-87.  Therefore, argued Plaintiffs, overall corridor Alternative 1 would be less environmentally damaging and also serve the project purposes.  However, Plaintiffs' argument does not take into account the rest of the stated goals for Section 3 which include serving local needs; personal accessibility for local residents and communities; improving traffic safety; and enhancing

local economic development.  AR 3784-87.  Specifically, the applicants state that Section

3 is intended to:

> provide increased access to Washington, Vincennes, the Crane Naval
> Surface Warfare Center, and Bloomfield.  Cranes is a major regional
> employment center, employing several thousand.  It has a considerable
> number of truck shipments of sensitive and hazardous materials that
> presently use two lane roads.  Shipments destined to the south and west
> would be able to use four land roadways (connecting to US 50, US 41) from
> the point where they leave Crane.  Washington is a major regional attraction
> for employment and shopping.  It is the major urban destination along the I-
> 69 corridor between Oakland City/Princeton and Bloomington.  By diverting
> traffic to a safer facility, this section may also help to reduce the unusually
> high rate of crashes for both fatal and injury crashes in Daviess County . . .
> The County's rates for both fatal and injury crashes are over 25% above
> statewide averages for rural counties.

AR 606-07.  The record before the Court indicates that the Corps was not unreasonable

in determining that Section 3 has independent utility and containing its analysis to the

alternatives that would be practicable with respect to that utility.  To that end, the Court

concludes that it was not arbitrary for the Corps not to consider Alternative 1, which follows

I-70 west to Terre Haute, Indiana then US 41 south to Evansville.  *See La. Wildlife Fed'n*

*Inc. v. York*, 761 F.2d 1044, 1047 (5th Cir. 1985) (stating that "not only is it permissible for

the Corps to consider the applicant's object; the Corps has a duty to take into account the

objectives of the applicant's project.  Indeed it would be bizarre if the Corps were to ignore

the purpose for which the applicant seeks a permit and to substitute a purpose it deems

more suitable.").

In oral argument, counsel for Plaintiffs conceded that the Corps review of

alternatives for Section 3 was adequate, and in their briefing, Plaintiffs did not challenge

the adequacy of the Corps' alternatives analysis regarding the various possible routes

within Section 3 itself.  Therefore, the Court concludes that the Corps' LEDPA analysis was

not arbitrary, capricious, in violation of the law, or otherwise not based on substantial evidence.

The Section 404 Guidelines also require the Corps to conduct a "public interest review" of a proposed project.  33 C.F.R. §320.4(a)(1).  The Corps must evaluate the "probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest."  *Id.*  The Corps must then balance those impacts against the reasonably foreseeable benefits of the proposed project.  *Id.*; *see also Hoosier Envtl. Council v. U.S. Army Corps of Eng'rs*, 105 F. Supp. 2d 953, 969 (S.D. Ind. 2000) (McKinney, J.).  Certain criteria are to be evaluated in every application for a permit: (1) the relative extent of the public and private need for the proposed structure or work; (2) where there are unresolved conflicts as to resource use, the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work; and (3) the extent and permanence of the beneficial and/or detrimental effects which the proposed structure or work is likely to have on the public and private uses to which the area is situated.   33 C.F.R. § 320.4(a)(2).   Additionally, certain factors—such as conservation, economics, aesthetics, general environmental concerns, wetlands, and historic properties, among others—are to be considered and evaluated based upon their relative importance to the project at hand.  *Id.* at § 320.4(a)(3).  In completing the public interest review, the Corps must carefully weigh all of the proposed activity's costs and benefits.  *Sierra Club v. Stigler*, 695 F.2d 957, 983 (5th Cir. 1983).

Plaintiffs argue that the Corps public interest review for the Section 3 permit was inadequate.  Specifically, Plaintiffs assert that in the final Decision Document for the permit, "the agency evaluated the entire I-69 highway project's benefits, but not its negative

environmental impacts.  The Corps' failure to examine the probable negative impacts of the entire I-69 project - rather than of Section 3 alone - rendered its public interest review inadequate."  Pltf's Br. at 28-29.  However, the language of the regulation defining the focus of the public interest review limits that focus to the effects of the "proposed activity":

> The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. . . . The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process.

33 C.F.R. § 320.4.  The above makes it clear that what is meant by "proposal" is that which the Corps has the capacity to authorize.  Only the portion of the overall project that occurs in the navigable waters of the United States can be authorized by the Corps.  *See Water Works & Sewer Bd. v. U.S. Dep't of Army*, 983 F. Supp. 1052, 1067 (N.D. Al. 1997).  "The Corps has no authority to permit or even regulate any other activity, although it may consider the direct, indirect, and cumulative impacts of the proposed activity.  The Corps' public interest review is not to cover the totality of all activities, however."  *Id.*

With respect to the proposed activity—Section 3—the Corps did weigh each of the required general factors and several of the specific factors.  *See* AR 13732-40.  Indeed, the only argument made by Plaintiffs with respect to the public interest review is that it was inadequate because it did not consider the totality of all activities related to the complete alignment chosen for the Indianapolis to Evansville branch of I-69.  Although the Corps did state that part of the public and private need for the project is "to provide improved regional accessibility and [i]nterstate and international movement of freight," it also set forth benefits related directly and specifically to Section 3 including increased employment and "changes in land use due to development . . . [that] are expected to yield an increase in business and

21

employment." AR 13739.  It is not arbitrary or capricious for the Corps to consider that one of the benefits accruing from the proposed action would be the facilitation of the I-69 project, but that does not mean that the analysis is impermissibly "skewed."  *Cf. Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.3d 407, 411 (9th Cir. 1989) (concluding that measuring the benefit of the proposed golf course in terms of its contribution to making  a resort an economically viable year-round facility with all of its attendant advantages was proper under the CWA).  Therefore, the Court concludes that the public interest review engaged in by the Corps is not arbitrary, capricious, in violation of the law or contrary to the substantial weight of the evidence.  Accordingly, the Court **GRANTS** the Defendants' motions for summary judgment[2] and **DENIES** Plaintiffs' motion.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court **DENIES** Plaintiff's Motion for Summary Judgment [dkt. no. 50], and **GRANTS** Defendants' Motions for Summary Judgment [dkt. nos. 73, 75].  Additionally, the Court **GRANTS** Defendants' Motion to Supplement the Administrative Record [dkt. no. 70].  Plaintiffs shall take nothing by way of their Complaint. Judgment will enter accordingly.

IT IS SO ORDERED this 24th day of July, 2012.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

_____

[2]INDOT made an argument asserting that Plaintiffs' claims and request for relief was barred by the applicable statute of limitations.  Having concluded on the merits that Plaintiffs cannot succeed in their claims, the Court declines to consider INDOT's statute of limitations argument.

Distribution to:

Andrew B. Armstrong
ENVIRONMENTAL LAW AND POLICY CENTER
aarmstrong@elpc.org

Albert M. Ferlo
PERKINS COIE LLP
aferlo@perkinscoie.com

Elisabeth C. Frost
PERKINS COIE LLP
efrost@perkinscoie.com

Mick G. Harrison
mickharrisonesq@earthlink.net

Timothy J. Junk
INDIANA OFFICE OF THE ATTORNEY GENERAL
tjunk@atg.state.in.us

William G. Malley
wmalley@perkinscoie.com

Daniel W. Pinkston
U.S. DEPARTMENT OF JUSTICE
daniel.pinkston@usdoj.gov

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov